# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD G. WARRICK, | Civil Action No. 13 - 1498 |
| Petitioner, | |
| v. | Chief Magistrate Judge Lisa Pupo Lenihan |
| STATE OF PENNSYLVANIA and THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA, | |
| Respondents. | |

## MEMORANDUM OPINION

Ronald G. Warrick ("Warrick" or "Petitioner") has petitioned the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his May 21, 2007 judgment of sentence for Third Degree Murder at case number 200511872 in the Court of Common Pleas of Allegheny County. He was sentenced to a term of incarceration of not less than twenty (20) years nor more than forty (40) years. In his petition, he raises two claims: (1) that the trial court failed to reinstruct the jury on voluntary manslaughter, and (2) that the evidence was insufficient to convict him for third degree murder. The petition, however, is untimely and must be dismissed.

### A. Relevant Factual History

As set forth by the Pennsylvania Superior Court in its Memorandum Opinion dated February 17, 2010, a summary of the pertinent facts are as follows:

On June 6, 2005, Othmane Lahmamsi ("the victim") and his friend, Mohcine El Joufri ("El Joufri") went to get lunch together. The victim was driving his uncle's car. While en route,

1

the victim received a call on his cell phone.  After talking with the caller, the victim informed El Joufri that they had to make a "quick stop" so that he could give six pounds of marijuana to "Dave."  According to El Joufri, although he had known Dave to buy an ounce of marijuana from them on previous occasions, they had never dealt with such a large quantity of the contraband.  El Joufri did not know Dave's last name that day, but later learned that his name was David King ("King").  El Joufri testified that there had been no friction or violence during any of the prior drug transactions.

In a second call, King gave the victim directions to Dix Way, an alleyway off of Larimer Avenue.  As they drove down the alley, El Joufri saw a black male whom he did not recognize.  After passing this man, the victim and El Joufri saw King waving for them to stop.  Once stopped, King introduced the black male ([Warrick]) to them.  According to El Joufri, there was a man on the nearby porch who [Warrick] referred to as his landlord.  Because [Warrick] did not want to "do this" in front of his landlord, he told the victim to back up his car, and the victim complied.  King then entered the rear passenger-side of the vehicle, while [Warrick] got in the car and sat behind the victim.

El Joufri testified that, after entering the car, [Warrick] pulled a gun from his waistband and said, "Sorry to do this to you, but this is how it's going down."  As he continued to point the gun back and forth between the victim and El Joufri, [Warrcik] opened the car door and got partially out of the car, his right leg remaining inside the vehicle.  [Warrick] then demanded that the victim give him the keys to the car and that the victim pop the trunk.  When they told him they did not have anything, [Warrick] responded, "I'm not fucking kidding you.  I'll blow your head off.  Give me the keys."

2

The victim then began to open his car door and told [Warrick] that he would give him the keys. He also looked back at King and said, "I can't believe this is how you do me." *Id*. at 58.[1] The victim then reached toward the ignition but, instead of grabbing the keys, hit the accelerator of the vehicle. In response, [Warrick] fatally shot the victim in the head. The car continued to move forward until it crashed into a telephone pole. [Warrick] and King were seen running to a vehicle parked on a nearby street and speeding from the scene. El Joufri testified that he panicked, and dialed 9-1-1. Remembering that there was marijuana in the car's trunk, and worrying about what the victim's parents would think upon learning that their son dealt drugs, El Joufri grabbed everything from the trunk and threw it into a nearby wooded area. El Joufri testified that neither he nor the victim had a gun during the incident.

When police arrived at the scene, a very distraught El Joufri told them that two men had stopped their car to get directions. Once they stopped, the men opened the car door, demanded everything they had in their pockets, and told them to open the trunk. However, when interviewed at headquarters later that day, he told the police the truth about what had transpired, told them that he knew the one perpetrator as "Dave," and gave a description of both men. He also told the police that he had dumped marijuana in the woods and took them to the location, where they recovered approximately five pounds of marijuana. Based on El Joufri's description of "Dave," the police used a photo imaging machine to generate pictures. After viewing hundreds of pictures, El Joufri positively identified King's photograph. A warrant was issued for King's arrest and he was taken into custody in Atlanta, Georgia on June 9, 2005.[2]

---

[1] At some point during the confrontation, King exited the vehicle and stood behind it.

[2] King was tried separately and convicted of third-degree murder. He was sentenced to fifteen to thirty years of imprisonment.

After further investigation, the police showed a photo array to El Joufri, who immediately identified [Warrick] as the shooter. A warrant was issued for [Warrick's] arrest, but the police were unable to locate him. Subsequently, the police sought assistance from the fugitive task force, and [Warrick] was eventually arrested six months later in Florida. [Warrick] waived his *Miranda*[3] rights and agreed to give a tape-recorded statement to the police.

At trial, [Warrick] testified on his own behalf. He stated that he had been friends with King for fifteen years and that he would often accompany King when King would purchase marijuana. According to [Warrick], when he accompanied King, he would usually carry a gun and provide protection should anything go wrong. In return, [Warrick] would receive an ounce of marijuana. On the day in question, King arrived at [Warrick's] mother's house and asked [Warrick] to ride with him to buy a pound of marijuana. According to [Warrick], King provided him with the gun and the two men drove to meet King's connection at Dix Way.

Upon arriving at Dix Way, [Warrick] entered the car behind the driver (the victim), while King entered the rear behind the passenger (El Joufri). [Warrick] testified that the victim began to back the car up when King asked for "weed," and El Joufri demanded the money. Because [Warrick] did not believe the transaction was proceeding in the usual manner, he and King began to exit the vehicle. According to [Warrick], at that point both the victim and El Joufri produced handguns and pointed weapons at him and King. [Warrick] testified that before he could exit the car completely, the victim began to drive away which caused him to be dragged by the vehicle. Fearing for his life, [Warrick] testified that he pulled out his own gun and fired in the general direction of the guns that were pointed at him. He further testified that once he was completely

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

outside the vehicle, he fired his weapon a second time because someone in the vehicle was still moving. [Warrick] stated that he then dropped his gun and ran until he caught up with King. The two men then entered their vehicle and left the scene.

[Warrick] further testified that he returned to his mother's house. He claimed that he did not know that he had hit anyone when he fired his weapon, and only learned about the victim's death when someone in his family told him that the victim's family was offering a reward for information about the gunman. Fearing that there was a bounty on his head, [Warrick] fled to Florida, where he was later apprehended.

(Comm. Exh. 19, APP 229-234) (ECF No. 11-1 at 1-6)[4] (citations to the trial transcript omitted).

### B. Relevant Procedural History

Petitioner was charged by Criminal Information in the Court of Common Pleas of Allegheny County at case number 200511872 with one count of Criminal Homicide, two counts of Robbery, and one count of Criminal Conspiracy, which arose from the June 6, 2005, shooting of victim Othmane Lahmamsi. (Comm. Exh. 2, APP 13-18.) Co-defendant David King was also charged with these offenses at case number 200509438. By motion dated March 20, 2006, the Honorable Lester G. Nauhaus granted Petitioner's motion to sever.[5] (Comm. Exh. 4, APP 24-28.)

On March 14, 2007, Petitioner appeared before Judge Nauhaus and proceeded to a jury trial. He was represented at trial by Attorney Lisa G. Middleman and Assistant District Attorney

---

[4] The Commonwealth Exhibits are docketed at ECF Nos. 10 & 11. They consist of 424 pages and will be referred to hereinafter by their Exhibit and "APP" number, which refers to the page of the Exhibit referenced.

[5] Co-defendant King's case was subsequently reassigned to the Honorable John C. Reilly Jr. In a non-jury trial, he was found guilty of Third-Degree Murder, but acquitted of the remaining charges. He was thereafter sentenced to fifteen (15) to thirty (30) years of imprisonment.

5

Jennifer DiGiovanni represented the Commonwealth. At the close of the Commonwealth's case, the trial court granted Petitioner's motion for judgment of acquittal on the conspiracy count. (TT 245.)[6] At the close of trial, the jury found Petitioner guilty of Third Degree Murder, but not guilty of Robbery. (TT 271.) On May 21, 2007, Petitioner appeared before Judge Nauhaus for sentencing and received a term of incarceration of twenty (20) to forty (40) years. Petitioner did not file a direct appeal.

On January 29, 2008, Petitioner filed a *pro se* petition that was subsequently construed by Judge Nauhaus as a petition pursuant to the Post-Conviction Relief Act ("PCRA"). (Comm. Exh. 6, APP 29-34.) Judge Nauhaus appointed Attorney Scott Coffey to represent Petitioner.

On October 24, 2008, Petitioner, through Attorney Coffey, filed a PCRA petition requesting reinstatement of appellate rights, *nunc pro tunc*. (Comm. Exh. 7, APP 35-45.) Following an evidentiary hearing on January 5, 2009, Judge Nauhaus reinstated Petitioner's post-sentence and appellate rights. (Comm. Exh. 9, APP 78.)

On January 13, 2009, Petitioner, through Attorney Coffey, filed a post-sentence motion, which raised claims challenging the sufficiency and weight of the evidence, as well as a claim that the sentence was excessive. (Comm. Exh. 10, APP 79-87.) On March 3, 2009, Petitioner appeared before Judge Nauhaus for an evidentiary hearing. Following the hearing, Judge Nauhaus, denied the post-sentence motion. (Comm. Exh. 12, APP 109-110.)

On May 4, 2009, Petitioner, through Attorney Coffey, filed a Notice of Appeal to the Superior Court. (Comm. Exh. 13, APP 111-126.) On June 16, 2009, Petitioner, through Attorney Coffey, filed a Concise Statement of Matters Complained of on Appeal. (Comm. Exh.

---

[6] Numerals in parentheses preceded by the letters "TT" refers to pages of the Jury Trial transcript dated March 14-16, 2007.

14, APP 127-134.) On July 14, 2009, Judge Nauhaus filed his Opinion. (Comm. Exh. 15, APP 135-140.) On February 17, 2010, the Superior Court affirmed Petitioner's judgment of sentence in case number 756 WDA 2009. (Comm. Exh. 16, APP 141-144; Exh. 19, APP 229-245.)

On March 12, 2010, Petitioner, through Attorney Coffey, filed a Petition for Allowance of Appeal in the Pennsylvania Supreme Court, which was docketed at case number 101 WAL 2010. (Comm. Exh. 20, APP 246-248; Exh. 21, APP 249-304.) On July 21, 2010, the Pennsylvania Supreme Court denied the petition. (Comm. Exh. 22, APP 305.)

On July 21, 2011, Petitioner filed a *pro se* PCRA petition. (Comm. Exh. 23, APP 306-310.) On August 29, 2011, Judge Nauhaus appointed Attorney Veronica Brestensky to represent Petitioner. On January 20, 2012, Judge Nauhaus issued a Notice of Intention to Dismiss the PCRA petition without a hearing. (Comm. Exh. 26, APP 342-348.) On February 29, 2012, Judge Nauhaus dismissed the petition. (Comm. Exh. 28, APP 352-354.)

On March 12, 2012, Petitioner filed a *pro se* Notice of Appeal. (Comm. Exh. 29, APP 355-359.) On April 18, 2012, Judge Nauhaus filed his Opinion. (Comm. Exh. 30, APP 360-368.) On October 19, 2012, the Superior Court, at case number 742 WDA 2012, affirmed the judgment of the Common Pleas Court. (Comm. Exh. 31, APP 369-372; Exh. 34 APP 417-424.) Petitioner did not file a Petition for Allowance of Appeal in the Pennsylvania Supreme Court.

On October 15, 2013, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in the above captioned matter.[7] (ECF Nos. 1, 4.)

---

[7] This is the filing date under the "mailbox rule." Pennsylvania and federal courts employ the prisoner mailbox rule. *See* Perry v. Diguglielmo, 169 Fed. Appx. 134, 136 n.3 (3d Cir. 2006) (citing Commonwealth v. Little, 716 A.2d 1287 (Pa. Super. Ct. 1998)); Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998). Under this doctrine, a prisoner's *pro se* pleading is deemed filed when delivered to prison officials for mailing. *See* Burns, 134 F.3d at 113; Commonwealth v. Castro, 766 A.2d 1283, 1287 (Pa. Super. Ct. 2001) (deemed filed when given to proper prison authority or placed in a prison mailbox).

## C. Time Period for Filing Federal Habeas Corpus Petitions

This proceeding is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA").[8]  Pursuant to the AEDPA, Congress imposed a one-year limitations period applicable to state prisoners, which provides as follows:

> (d)(1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2)  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

28 U.S.C. § 2244(d).

The statute of limitations set out in § 2244(d)(1) must be applied on a claim-by-claim basis.  Fielder v. Varner, 379 F.3d 113 (3d Cir. 2004), *cert denied*, 543 U.S. 1067 (2005).  In

---

[8] Because Petitioner filed his federal habeas petition after the effective date of the AEDPA, the Court must apply the standards set forth in the AEDPA to his claims for federal habeas relief.  *See* Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2000) (citing Lindh v. Murphy, 521 U.S. 320, 336 (1997)).

8

analyzing whether a petition for writ of habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry. First, the court must determine the "trigger date" for the one-year limitations period pursuant to section 2244(d)(1). Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute pursuant to section 2244(d)(2). Third, the court must determine whether any of the other statutory exceptions or equitable tolling should be applied on the facts presented.

As to the first inquiry, the "trigger date" for AEDPA purposes in the instant case is the date that Petitioner's judgment of sentence became final pursuant to section 2244(d)(1)(A).[9] Petitioner was sentenced on May 21, 2007, and he did not file a direct appeal. However, following an evidentiary hearing that occurred on January 5, 2009, his post-sentence and direct appeal rights were reinstated *nunc pro tunc*. After the filing of a direct appeal, the Pennsylvania Superior Court affirmed Petitioner's judgment of sentence on February 17, 2010. On July 21, 2010, the Pennsylvania Supreme Court denied his petition for allowance of appeal. Allowing ninety (90) days to file a petition for writ of certiorari to the United States Supreme Court, which Petitioner did not do, his judgment of sentence became final for AEDPA purposes on October 19, 2010. Thus, Petitioner's one-year limitations period started to run on that day.

As to the second inquiry, the one-year limitations period was tolled during the pendency of Petitioner's "properly filed" state post-conviction proceedings pursuant to section 2244(d)(2). In this case, 274 days of the one-year limitations period elapsed before Petitioner filed his first PCRA petition on July 21, 2011. Those proceedings remained pending until the Superior Court

---

[9] Petitioner does not assert that there was an impediment to filing his habeas petition which was caused by state action, that his petition involves a right which was newly recognized by the United States Supreme Court, or that there are new facts which could not have been previously discovered. *See* 28 U.S.C. § 2244(d)(1)(B)-(D).

affirmed the judgment of the Court of Common Pleas on October 19, 2012. Allowing thirty (30) days to file a petition for allowance of appeal to the Pennsylvania Supreme Court, which Petitioner did not do, the one-year limitations period started to run again on November 19, 2012. Another 330 days elapsed before Petitioner filed his habeas corpus petition on October 15, 2013. Thus, a total of 604 days (274+330) elapsed before the filing of the instant petition. As such, the petition is untimely because it was not filed within the one-year statute of limitations period.

Petitioner did not file a response to the Commonwealth's Answer, so as to the third inquiry, Petitioner makes no argument for the applicability of equitable tolling or any statutory exceptions to the one-year limitations period. Consequently, the Court must dismiss his petition as untimely.

### D. Certificate of Appealability

A certificate of appealability will be denied because Petitioner has not made a substantial showing of the denial of a constitutional right or shown that jurists of reason would disagree that his habeas petition was untimely filed. *See*, *e.g.*, Slack v. McDaniel, 529 U.S. 473 (2000) (explaining standard for grant of a certificate of appealability where court does not address petition on the merits but on some procedural ground); Walker v. Government of the Virgin Islands, 230 F.3d 82, 89-90 (3d Cir. 2000).

### E. Conclusion

For the foregoing reasons, the Petition for Writ of Habeas Corpus (ECF No. 4) will be dismissed as untimely and a certificate of appealability will be denied. A separate order will issue.

Dated: April 17, 2014

/s/ Lisa Pupo Lenihan

Lisa Pupo Lenihan  
Chief United States Magistrate Judge

cc: Ronald G. Warrick  
    HB-7997  
    SCI Pittsburgh  
    PO Box 99991  
    Pittsburgh, PA 15233  
    *Via First Class Mail*

    Counsel of Record  
    *Via CM/ECF Electronic Mail*